1  JEFFREY C. HALLAM (State Bar No. 161259)
   E-Mail:       *jhallam@sideman.com*
2  LYNDSEY C. HEATON (State Bar No. 262883)
   E-Mail:       *lheaton@sideman.com*
3  MICHAEL H. HEWITT (State Bar No. 309691)
   E-Mail:       *mhewitt@sideman.com*
4  SIDEMAN & BANCROFT LLP
5  One Embarcadero Center, Twenty-Second Floor
   San Francisco, California 94111-3711
6  Telephone:     (415) 392-1960
7  Facsimile:     (415) 392-0827

8  Attorneys for Plaintiffs Cisco Systems, Inc.
   and Cisco Technology, Inc.

9

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 2ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3629

10

11                 **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13  CISCO SYSTEMS, INC., a California            CASE NO.  3:19-cv-7514
    corporation; CISCO TECHNOLOGY,
14  INC., a California corporation,              **COMPLAINT FOR DAMAGES AND**
                                                 **INJUNCTIVE RELIEF:**
15                  Plaintiffs,
16                                               **1. INDUCING BREACH AND INTERFERING**
        v.                                          **WITH CONTRACT;**
17                                               **2. FRAUD**
    MUSHKIN, INC., a Colorado corporation        **3. AIDING AND ABETTING FRAUD**
18  (d/b/a ENHANCED NETWORK                      **4. CONSPIRACY**
    SYSTEMS); JEFFREY RAMEY, an                  **5. NEGLIGENT MISREPRESENTATION;**
19  individual; DOES 1-10,                       **6. TRADEMARK INFRINGEMENT, 15**
                                                    **U.S.C. § 1114;**
20                  Defendants.                  **7. TRADEMARK COUNTERFEITING, 15**
                                                    **U.S.C. § 1114;**
21                                               **8. FEDERAL UNFAIR COMPETITION, 15**
                                                    **U.S.C. § 1125;**
22                                               **9. CALIFORNIA UNFAIR BUSINESS**
                                                    **PRACTICES, CAL. BUS. & PROF. CODE §**
23                                                  **17200, *et. seq.;* and,**
24                                               **10. UNJUST ENRICHMENT.**
25
26                                               **DEMAND FOR JURY TRIAL**
27
28

Plaintiffs Cisco Systems, Inc. ("CSI") and Cisco Technology, Inc. ("CTI") (together, "Cisco" or "Plaintiffs"), hereby complain and allege against Defendants Mushkin, Inc., a Colorado (d/b/a Enhanced Network Systems ) ("ENS" or "Enhanced Network Systems") and Jeffrey Ramey ("Ramey") (together, "Defendants') as follows:

## I.    INTRODUCTION

1.    From December 2016 to October 2018, Ramey, a Senior Account Manager at Cisco Authorized Reseller, General Data Tech ("GDT"), in collusion with secondary market unauthorized reseller ENS, orchestrated and maintained a sophisticated fraud scheme against Cisco by using the name of a falsified end user – Provident Realty Advisors ("Provident") – to obtain significant discounts on millions of dollars' worth of Cisco products.  The charade involved repeated, false statements to Cisco regarding "Provident," claiming that this purported end user needed discounted pricing for large amounts of networking products to be put in service in various real estate developments.  In truth, Cisco's later investigation revealed that the real Provident Realty Advisors had never purchased Cisco products, never heard of Ramey, and had never agreed to act as a "front" for Ramey and ENS' scheme.  The products, instead, went to ENS' true end customers and the profit from the fraudulently obtained discounts, on information and belief, was split between Ramey and ENS.  Over the course of their scheme, Ramey and ENS purchased approximately $17.1 Million worth of Cisco products by fraudulently negotiating discounts of 70-80%, resulting in millions of dollars in loss to Cisco.

2.    Upon information and belief, Defendants also worked together to induce numerous Cisco Authorized Resellers to breach their agreements with Cisco by purchasing products from the "Provident" scheme.

3.    The "Provident" scheme ended only after Cisco's internal Brand Protection team discovered that the products sold under the Provident account had ended up with numerous end customers all over the country with no connection to or association with the real "Provident Realty Advisors," a real estate development company located in Dallas, Texas.

4.    In addition, for over a decade, Defendant ENS has been selling, attempting to sell, offering to sell, importing, and/or distributing counterfeit "Cisco" products to customers, including

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 2ᴺᴰ FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3629

1  the governmental entities and companies with other sensitive infrastructure.  Cisco is aware of at

2  least 477 counterfeit Cisco products ENS sold to customers including the U.S. Department of the

3  Navy, the U.S. Justice Department, and California Department of Industrial Relations.

**II.     THE PARTIES**

5       5.       Plaintiff Cisco Systems, Inc. is, and at all times mentioned herein was, a California

6  corporation, with its principal place of business at 170 W. Tasman Drive, San Jose, California

7  95134.  Plaintiff Cisco Technology, Inc. is, and at all times mentioned herein was a California

8  corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California

9  95134.  CTI owns the trademarks used by CSI in marketing Cisco-branded products.

10      6.       Upon information and belief, Defendant Mushkin, Inc. is, and at all relevant times

11  was, a corporation  located  in Colorado with its principal business address at 14 Inverness Drive

12  East, Suite F-100, Englewood, Colorado 80112 and does business under the name "Enhanced

13  Network Systems."

14      7.       Upon information and belief, Defendant Ramey is, and at all relevant times was, an

15  individual residing in Texas, with the last known address of  309 Scenic Glen Drive, Mansfield,

16  Texas 76063.

**III.     JURISDICTION AND VENUE**

18      8.       This Court has diversity jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §

19  1332.  Each of the Plaintiffs is a corporation incorporated under the laws of the State of California,

20  having its principal place of business in the State of California.  Upon information and belief,

21  Defendant ENS is a corporation with its principal place of business in the State of Colorado.

22  Upon information and belief, Defendant Ramey is a citizen of the State of Texas.  The amount in

23  controversy exceeds $75,000, exclusive of interest and costs.

24      9.       This  Court also has original subject matter jurisdiction over Plaintiffs' claims

25  relating to violations of the Trademark Act of 1946, 15 U.S.C. §§ 1051 et seq. (the "Lanham Act")

26  pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1121, as well as under 28 U.S.C. §§

27  1331 and 1338(a) and (b).

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

10.     This Court further has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367 as those claims are so related to Cisco's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

11.     This Court has personal jurisdiction over Defendants ENS and Ramey, who have engaged in substantial business activities in this district, misled consumers and Plaintiffs by their conduct in this district or conduct directed into this district, directed business activities at this district, and committed tortious acts with knowledge that the effects of their acts would be felt by Cisco in this district.

12.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Cisco's claims occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this district.  Venue is also proper because Defendants are each subject to personal jurisdiction in the Northern District of California.

## IV.     INTRA-DISTRICT ASSIGNMENT

13.     In accordance with Civ. L.R. 3-2(c), this action is properly assigned to the San Francisco Division or the San Jose Division as a substantial part of the events or omissions giving rise to Cisco's claims occurred in the San Francisco Division and a substantial part of the property that is the subject of the action is situated in the San Jose Division.

## V.     FACTUAL ALLEGATIONS

### A.     Cisco's Business and History

14.     Cisco was founded in 1984 and is the worldwide leader in developing, implementing, and providing the technologies behind networking, communications, and information technology products and services.  Cisco develops and provides a broad range of networking products and services that enable seamless communication among individuals, businesses, public institutions, government agencies, and service providers.  Specifically, the thousands of engineers who work at Cisco develop and provide networking and communications

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   hardware, software, and services that utilize cutting-edge technologies to transport data, voice, and

2   video within buildings, across cities and campuses, and around the world.

3        15.    Since its founding, Cisco has pioneered many of the important technologies that

4   created and enabled global interconnectivity.  During the past three decades, Cisco has invested

5   billions of dollars, and the time and dedication of thousands of its engineers, in the research,

6   development, and sale of industry-leading networking and communications products and services.

7        16.    Cisco has also built up tremendous goodwill and brand reputation among

8   consumers, including corporate and government consumers, through significant investment in

9   advertising, promoting, and delivering products, software, and services of the highest quality

10  under Cisco's CISCO trademark and trade name and the family of CISCO-related trademarks (the

11  "CISCO Marks").  Cisco has used the family of CISCO Marks to identify goods and services as

12  being genuine and authorized, and therefore, the CISCO Marks are well-recognized signifiers of

13  Cisco's best-in-class products, software, and services.

14       **B.    <u>Cisco's Sales Procedures and Discount Fraud Deterrence Approach</u>**

15       17.    Cisco's annual revenue from the sale of hardware, software, and related services is

16  approximately $50 billion dollars world-wide.  In order to support this global market, for the great

17  majority of its sales, Cisco relies upon a system of independent distributors and resellers located

18  throughout the world.  This system is commonly used in the IT hardware and networking industry.

19  These independent distributors and resellers, referred to as "Authorized Channel Partners,"

20  "Partners" or "Authorized Resellers," typically represent several other equipment manufacturers,

21  in addition to Cisco.  Among other things, Cisco's distribution system allows it to maintain

22  expertise and a local presence in regions of the world where there would not otherwise be

23  sufficient business to support it.

24       18.    Authorized Resellers are required to enter into contractual relationships with Cisco

25  that allow them to purchase Cisco products and services at a partner discount from Cisco's

26  authorized distributors.  The most common contractual relationship is called an Indirect Channel

27  Partnership Agreement ("ICPA").  This agreement requires Authorized Resellers to purchase

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  Cisco products and services only from Cisco or authorized distributors and to sell those products

2  and services only to end customers for their internal use ("End Users").

3      19.    On occasion, a customer will request a large, non-standard discount in order to

4  purchase Cisco products.  Typically, this occurs when an End User has a major project and has the

5  choice of installing Cisco network hardware or products sold by one of Cisco's competitors.  In

6  such an instance, a Cisco Authorized Reseller may request that Cisco and the Authorized

7  Distributor approve a deviation from the standard pricing, to permit the Authorized Reseller to

8  purchase the equipment at a discounted price from the Authorized Distributor, and then sell the

9  products to the End User at the discounted price.  Depending on the extent of the deviation, a

10  particular discount request is reviewed by Financial Controllers, a Region Manager ("RM"), or

11  even an Operations Director ("OD").

12      20.    Generally, Cisco Authorized Resellers are not permitted to sell to other Authorized

13  Resellers or unauthorized resellers (such as Defendant ENS) and can only sell Cisco products to

14  End Users themselves.  Cisco Authorized Resellers are also required to purchase Cisco products

15  only directly from Cisco Authorized Distributors or Cisco itself and may not purchase Cisco

16  products from other Authorized Resellers or unauthorized resellers (such as Defendant ENS).

17  Cisco Authorized Resellers purchase Cisco products at prices that are set by the Authorized

18  Distributor, and which typically amount to discounts in the amount of approximately 35%-42%

19  depending upon the Authorized Reseller's partnership level.

20      21.    Generally, discount fraud schemes against Cisco require a level of sophistication

21  and knowledge about Cisco's distribution model that is typically only achievable with an intimate

22  knowledge of Cisco's internal operations.  While Cisco's internal controls have made a material

23  difference in deterring such schemes, a sophisticated individual or entity implementing a complex

24  and successful discount fraud scheme can cause Cisco to suffer significant financial harm.

25      **C.    Cisco SMARTnet Contracts and Warranty**

26      22.    In addition to selling its products, Cisco also sells optional service contracts, known

27  as "SMARTnet" contracts.  Identifying and correcting customers' technical problems in a prompt

28  and efficient manner is an important part of Cisco's business model because customers often rely

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

upon Cisco products for mission critical functions.  SMARTnet contracts provide customers with enhanced warranty service on their purchased products on an expedited basis.

23.     On the relatively rare occasions when Cisco parts fail, SMARTnet contracts offer customers "Advance Replacement Parts."  As the name suggests, the "Advance Replacement Parts" feature, or "Return Material Authorizations ("RMAs")," provide customers with an advance replacement of a malfunctioning Cisco product before the customer returning the defective product to Cisco.  This prevents customers from having long periods of downtime to their networks.  The terms and conditions of the SMARTnet contract require, in part, that (1) the product for which advance replacement is sought be validly covered by the SMARTnet contract, and (2) the customer return the allegedly defective product giving rise to the claim made pursuant to the SMARTnet contract.  The customer must pay Cisco if it fails to return the failed part for which it made a claim.

**D.     Cisco's Trademarks**

24.     CTI owns all rights, title, and interest in the CISCO Marks, which are included on the Principal Register of the U.S. Patent and Trademark Office.  The CISCO Marks are well-known.  They are used in connection with Cisco's networking hardware and software products and services.  They include, but are not limited to, the following marks that are used in interstate commerce:

| Mark | Registration Number | Registration Date |
|---|---|---|
| CISCO | 1,542,339 | June 6, 1989 |
| CISCO SYSTEMS | 1,996,957 | August 27, 1996 |
| CISCO | 2,498,746 | October 16, 2001 |
|  | 3,759,451 | March 9, 2010 |
| CISCO | 3,978,294 | June 14, 2011 |
|  | 4,263,591 | December 25, 2012 |

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

25.    The CISCO Marks are distinctive, having no meaning outside of their use by Cisco in its course of business operations and in its advertising to distinguish its products and services. Cisco uses the CISCO Marks to advertise through a wide variety of media including television, radio, newspapers, magazines, billboards, direct mail, and websites.

26.    Cisco has attained one of the highest levels of brand recognition among consumers due to its extensive advertising and promotional efforts and its continuous use of its core CISCO Marks for the past three decades.  As a result of Cisco's longstanding and widespread use and promotion of the CISCO Marks, Cisco customers around the globe have come to rely upon the CISCO Marks to identify Cisco's high-quality hardware, software, and services.

27.    Cisco's customers associate Cisco's famous and well-known CISCO Marks exclusively with Cisco and Cisco's products and services.  When consumers encounter these marks and decide to purchase goods and services identified by these marks, they expect to receive genuine Cisco products that have been produced by Cisco and meet Cisco's rigorous quality control standards.

**E.    Counterfeit "Cisco" Products**

28.    Counterfeit products that bear markings similar or identical to the CISCO Marks provide customers with a false assurance that the products they have purchased: (1) are reliable and conform with Cisco's high standards, (2) come with applicable warranties, (3) can be placed under a Cisco service support contract (i.e., SMARTnet) without payment of extra relicensing or inspection fees, and (4) have been produced in accordance with Cisco's quality assurance standards.

29.    In addition to harming Cisco's customers, the sale of counterfeit Cisco products also harms Cisco in many ways.  Among these, counterfeit Cisco products which fail or degrade create the false impression that Cisco products are unreliable, thereby improperly tarnishing Cisco's reputation and causing Cisco to suffer lost sales and future business opportunities.  When customers purchase Cisco-branded parts that are counterfeit and unreliable, their image of Cisco is diminished and Cisco's opportunity to sell genuine, high-quality products to those customers may

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

be lost forever.  As a result, Cisco suffers substantial and irreparable harm to its brand, image, business, and goodwill with the public.  Cisco also suffers lost sales when customers purchase counterfeit products instead of genuine Cisco products.  Cisco also suffers when a customer obtains SMARTnet coverage for a counterfeit product, which Cisco may then feel obligated to service and replace, if necessary, for customer service and satisfaction reasons.

**F.**  **Impact on Health, Safety, and National Security Caused By Counterfeit Cisco Products**

30.     Cisco products are part of the backbone of the United States information network. Many of Cisco's products are purchased by U.S. governmental entities, the military, hospitals, and by other industries, and used in important and life-essential applications.  Certain critical governmental and other infrastructure is built on, and relies upon, Cisco products to maintain the security of data storage and transfer.

31.     The importance of certain critical infrastructure's reliance on the quality of Cisco products cannot be overstated.  Cisco firewalls, for example, ensure the integrity of government, medical, and business data and communications.  Many critical government functions rely upon the performance of high-quality Cisco products, as compared to the dangers posed by lower quality counterfeits.

**G.**  **Defendants' Fraudulent Conduct**

32.     As described above, Ramey and ENS worked together for nearly two years to perpetrate a massive discount fraud scheme and obtain unwarranted, steep discounts on Cisco product by providing false information regarding purported End User "Provident."

33.     Ramey worked as a Senior Account Manager for Cisco Authorized Reseller GDT from approximately late 2016 until October 2018.  As an employee or independent contractor of Cisco Authorized Reseller GDT, Ramey had the ability to request discounted pricing from Cisco. Upon information and belief, based on his experience at GDT (and prior employers who also sold Cisco products), Ramey was familiar with the process for requesting and obtaining discounted pricing from Cisco.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

34.     Upon information and belief, Cisco's investigation of the "Provident" scheme has uncovered that, on or around December 6, 2016, prior to the first transactions with Cisco under the "Provident" name, Jeff Ramey, Bill Cox (Director of Sales at ENS), and Charles Carlson (CEO of Comware Inc., a broker specializing in the sale of audio-visual equipment) met, presumably regarding the purchase of Cisco products under the "Provident" account.[1]

35.     Just days later, in or around December 12, 2016, Ramey contacted Cisco claiming that GDT had a new customer, Provident, that was looking to purchase $5 million worth of Cisco products.  Ramey told Cisco that Provident was a real estate company based in Dallas that purchased and installed networking products in the buildings it developed.  Ramey also told Cisco that, to make the deal work, Provident would need approximately 70-80% off of the list price in order to "… replace all of the HP switches in [Provident's] existing building."  Ramey further claimed that more deals would follow as Provident had plans to develop several other buildings through the rest of that fiscal year and would likely purchase more Cisco product as a result.  Cisco would later discover that, while "Provident Realty Advisors" was a legitimate real estate company located in Dallas, its representatives had never heard of Ramey and claim to have never purchased Cisco products.

36.     On the first Provident deal, based on the information provided by Ramey and relied upon by Cisco, Cisco approved a discount of approximately 66% off Cisco's Global List Price, agreeing to sell $900,000 worth of products for approximately $300,000.  While Ramey was telling Cisco that discounts were needed to replace HP (a competitor's) gear in a building Provident owned, he was separately emailing with Bill Cox at ENS about filling a stocking order

---

[1] Upon information and belief, Charles Carlson is a personal contact of Ramey.  Cisco is informed that Ramey knew Carlson from Mr. Ramey's prior employment with a company called Synetra.  Cisco is informed that Synetra's and Comware's offices were located in the same building and that Ramey and Carlson would often refer business to each other.  Cisco has also uncovered information suggesting that Ramey and Carlson also owned an LLC together (Todoverde Consulting Ventures, LLC) during the Provident scheme, as described more-fully below.  Later on in the Provident scheme, Comware acted as an intermediary between GDT and ENS, the unauthorized reseller ultimately selling the fraudulently obtained "Provident" gear to end customers.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    for ENS with the very same Cisco product.  On December 16, 2016, just days after Ramey

2    submitted the first Provident discount request to Cisco, Cox sent Ramey an order for Cisco

3    products identical or nearly identical to the products included in the discount request submitted by

4    Ramey to Cisco for the Provident "HP replacements."  Emails between Cox and Ramey also

5    detailed the margin split between Ramey and ENS, showing "Jeff's" margin as $47,750 and

6    "Bill's" margin at $41,322.

7              37.      On December 19, 2016, Ryan Bolger, an Operations Manager at ENS, sent Ramey

8    a purchase order for the gear identified in the ENS estimate, showing the end customer as "PRA,"

9    (indicating "Provident Realty Advisors") and listing the address as 2838 Market Loop, Suite 100,

10   Southlake, Texas – an address that, upon information and belief, is associated with Comware, a

11   company run by Ramey's associate Charles Carlson, and *not* related in any way with the real

12   Provident Realty Advisors.  At that time, Ramey did not tell Cisco that ENS was involved in the

13   purchase of product under the "Provident" name.

14             38.      Thereafter, Ramey submitted the first order of products under the "Provident"

15   account to Cisco, either directly or through an assistant.  Cisco is informed and on that basis

16   alleges that such product was never intended for and never made it to the real Provident Realty

17   Advisors.

18             39.      From December 2016 on, until the scheme was uncovered by Cisco Brand

19   Protection in October 2018, Ramey continued to process orders for ENS under the "Provident"

20   account in the same manner.  Cisco's investigation has revealed that Ramey would receive

21   requests for orders from ENS – for either ENS' true end customers, or for product to stock ENS'

22   shelves – and process them under the "Provident" account name at Cisco, requesting steep

23   discounts based on falsified information.  Ramey consistently requested discounts between 70-

24   80%, claiming that such pricing was necessary to beat out competitors for different Provident

25   development projects.  For example, Ramey told one of Cisco's account managers that the

26   discounted pricing was needed on networking equipment to outfit a new "Ross building" as part of

27   a larger project of building rollouts.  In fact, the "Ross building" project was used to justify

28   discounts on at least 30 separate discount requests to Cisco.  Upon information and belief, the

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

"Ross building" was a pure fabrication by either Ramey, ENS, or both, and the name "Ross" was used because Ross Miller is Director of Operations at ENS and was often listed as the contact point for products being shipped to "Provident."

40.     Except for the first shipment (which was associated with an address linked to Comware), all shipments for product under the "Provident" account were delivered not to the real Provident Realty Advisors, nor its developments, but directly to ENS' address in Colorado: 141 Inverness Drive West, Englewood.

41.     Throughout the run of the "Provident" scheme, Ramey prevented the account managers at Cisco from having any direct contact with the end customer at "Provident," despite repeated requests.  Ramey refused to provide contact information and insisted that all communication to "Provident" flow through him and his team at GDT,  claiming that "Provident" did not want to interface directly with Cisco.  When one Cisco representative attempted to contact "Provident" directly, upon information and belief, Ramey became very upset and refused to work with that Cisco representative ever again.

42.     Ramey claimed to be in contact with certain individuals at "Provident" who would dictate the products needed and negotiate price points.  Ramey would sometimes indicate that he had spoken with or was planning on speaking with "Tony" at "Provident," and at other times said he had spoken with or was planning on speaking with "Tommy Sanders" at the company.  Cisco's investigation would later uncover that no "Tony" or "Tommy Sanders" ever worked at Provident Realty Advisors and that no one at Provident Realty Advisors had any recollection of ordering any Cisco product.  Instead, all of the Cisco product ordered by Ramey for "Provident" went to service ENS' customers.

### i.     ENS' Sales to the San Francisco Airport

43.     One example of Ramey's and ENS' scheme is particularly illustrative – the April 2017 sale of Cisco products to the San Francisco International Airport.

44.     On April 26, 2017, Cox at ENS emailed Ramey and Ramey's assistant, Venida Jackson, regarding the purchase of 7 industrial Cisco Ethernet switches and 14 power supplies.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

45.     The next day, on April 27, 2017, Ramey created an estimate on Cisco's "Build Price" tool for 7 industrial Ethernet switches and 14 power supplies, describing it as a "PRA industrial switch deal."  Ramey shared the quote with an Account Manager at Cisco, who then submitted the deal request under Deal ID number 17680067 under the "Provident" account, with notes indicating that Ramey claimed a discount was necessary in order to beat out the competition for "Provident's" business in a highly competitive time frame.  Cisco approved a 68% discount based on Ramey's submission.

46.     On April 28, 2017, Ross Miller, Director of Operations at ENS, sent Ramey a purchase order for the seven switches and corresponding power supplies with a "Ship To" address of "Mushkin, Inc./ENS"[2] at ENS' Englewood, Colorado address.  Provident's name did not appear on the purchase order.  Ramey then submitted an order for the same switches and power supplies to Cisco, but under the "Provident" account.

47.     On May 16, 2017, after the products had been shipped to ENS, Miller sent Ramey and Venida Jackson a separate purchase order for SMARTnet coverage for the same seven switches.  The cover email identified product serial numbers which linked back to the same seven switches ordered under the "Provident" Deal ID 17680067 approved on April 27, 2017.  In the order for SMARTnet coverage, Miller also identified the true End User of the products as "San Francisco International Airport," which, upon information and belief, has no connection with or relation to the real Provident Realty Advisors in Dallas, Texas.

48.     Ramey and ENS continued in this same manner dozens of times over the length of the scheme, communicating with each other about the true End Users of the products purchased by ENS, yet submitting information to Cisco claiming all the product was going to "Provident."

///

///

---

[2] According to Mushkin's corporate filings with the Colorado Secretary of State, Mushkin assumed the trade name of "Enhanced Memory Services," which specializes in the sales of computers and specialty memory products.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

> ii.    **Ramey's Pattern and Practice of Obtaining Discounts Under the Provident Scheme**

49.     In general, the "Provident" scheme would proceed as follows: Cox and others at ENS would regularly email Ramey asking whether Ramey could provide better discounts for Cisco product than ENS' other suppliers.  Ramey would then create BuildPrice Estimates on Cisco's online tool for the same exact products ordered by ENS, under the auspice of the "Provident" account.  Ramey became so confident in his scheme that on one occasion, Ramey willingly bragged to Cox that he could get a discount of "70-72% easy" before even creating a BuildPrice estimate and submitting it to Cisco.

50.     Ramey submitted multiple deals under the "Provident" name even though ENS was clear with Ramey that the end customer was, in fact, not Provident Realty Advisors, but rather included, but was not limited to, Northrop Grumman, the San Francisco International Airport Commission (as described above), and others.

> iii.   **"Stocking Orders" for ENS, Submitted under the "Provident" Name**

51.     Ramey would often also fulfill "stocking" orders for ENS under the "Provident" account, presumably so that ENS would have plenty of Cisco products on hand at cheap prices in order to sell to its customers.  For example, on January 26, 2018, Ross Miller of ENS emailed Ramey saying "attached is our stocking P.O." and included a purchase order numbered "PO 33909."

52.     At or around the same time, Ramey misrepresented to Cisco that "Provident" was looking to purchase Cisco products for use in three separate development projects and was looking to combine them into one order, amounting to approximately $9.6 million worth of networking gear.  Cisco authorized a 73% discount for the deal – meaning Cisco would only receive approximately $2.6 million – and assigned Deal ID number 18012258 to the approval.

53.     Ramey then ordered the same product ENS had sought under its "stocking P.O." under the newly-approved "Provident" discount.  The link to ENS' "stocking P.O." is clear as Ramey used ENS' purchase order number "PO 33909" as the "End Customer to Reseller PO Number" when submitting the order under the 18012258 Deal ID to Cisco.

54.     Just like the other products ordered under the "Provident" account, the products shipped not to the real Provident Realty Advisors, but to ENS in Englewood Colorado.

### iv.     Cisco's Brand Protection Team Questions Ramey – False Information Provided

55.     In April 2018, a Cisco Account Manager covering the State of Washington discovered that his customer, Washington Technology Solutions ("WATech"), had purchased Cisco products from an unauthorized reseller doing business as DataSpan.  Through an investigation, the Account Manager uncovered that the products in question had been originally sold to GDT under the "Provident" name, but had somehow ended up with this unauthorized reseller.

56.     In response to Cisco's communications to Ramey and GDT regarding the diverted WATech product, Ramey told various stories.  The original order information given to Cisco regarding these products was submitted by Ramey or his team under the "Provident" account and accompanied by an explanation that the products were intended for "ross building add ons."  Once the diversion of the product was uncovered and Cisco found out that the product was not with Provident or in any "ross" building, Ramey scrambled for different explanations.

57.     Ramey told Cisco Account Manager Sydney Green that the DataSpan Products had, in fact, initially been sold to "Provident," but were installed in one of "Provident's" buildings in Washington State that was subsequently sold.  Ramey told Cisco Channel Account Manager Jay Acosta that the DataSpan products had been part of a "remodel" that "Provident" did and, for the first time, admitted that ENS was involved with "Provident," claiming that "as far as we know they ordered this [Bill of Materials] for a building that they contract ENS to manage for them."  Ramey also provided Acosta with what he claimed was the original purchase order that accompanied the deal submission.

58.     Around this same time, Colin Abe, a member of Cisco's Brand Protection Team, was informed of the WATech diversion and Abe recognized ENS as a well-known unauthorized reseller of Cisco products.  On April 18, 2018, Abe requested additional information about the WATech deal from GDT's General Counsel, Elya Blataric.  Blataric provided Abe with a different

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   version of the story, which she purportedly obtained from Ramey.  Blataric stated that "PRA

2   requested the quote for Cisco products from GDT for their Denver project being handled by their

3   service provider ENS[,]" and that "PRA determined that order was not needed for the Denver

4   project and was thus canceled by PRA."

5        59.     One of Cisco's regional account managers, Eric Power, recalls that Ramey

6   admitted at the time that while ENS was allegedly a legitimate "service provider" for "Provident,"

7   an employee at ENS had taken advantage of the "Provident" discount and was selling product

8   purchased under the "Provident" name to others on the secondary market.

9        60.     Not only did Ramey provide different explanations for how the "Provident"

10   product ended up at WATech depending upon the individual with whom he was speaking, Ramey

11   also presented likely falsified documents to Cisco to substantiate his story.

12        61.     In April 2018, in response to a request by Cisco's Jay Acosta, Ramey provided

13   Cisco a copy of the purported "original" purchase order for the product to support his version of

14   the events, which showed "Provident/Enhanced" as the purchaser in the logo/letterhead.



(Purchase Order sent by Ramey to Cisco on April 10, 2018)

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

62.     However, through its later investigation of the "Provident" scheme, Cisco was able to obtain ENS' original purchase order, which told a very different story.  The original purchase order dated March 14, 2018 did not reflect the "Provident" name at all, but showed solely ENS' name and logo in the upper-left hand corner:



(Original Purchase Order Sent by ENS to Ramey on or around March 14, 2018)

63.     Comparing the original purchase order to the one Ramey sent to Cisco Brand Protection in April 2018, it is evident that the document sent to Cisco was doctored to add the "Provident" name before sending it on.  In fact, not **one** of the other original purchase orders ENS sent to Ramey that Cisco has reviewed contain the "Provident/Enhanced" logo as depicted in the first picture above.  The most likely explanation for this discrepancy is that either Ramey, ENS, or both, doctored the document before sending it to Cisco Brand Protection to justify why the products were originally purchased under the "Provident" account.

64.     After this diversion was discovered, GDT and Ramey told Cisco they would cease processing orders for "Provident" through ENS and claimed "Provident" would cut its own purchase orders going forward.

65.     An email uncovered during Cisco's later investigation revealed that ENS internally circulated communications from Cisco Brand Protection regarding the diverted product.  ENS' President, George Stathakis said, in an email to ENS' Chief Sales Officer and Senior Advisor Chad Love, Ramey and Bill Cox: "We're learning from these, but I'd much rather learn in the classroom than in real life."

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

### v.  Comware Enters As Intermediary

66.    After the ENS connection was discovered, despite promises from Ramey that ENS would no longer be involved with the "Provident" account, given the amount of money to be made, it was business as usual between ENS and Ramey.  To continue their scheme and avoid detection by Cisco, Ramey and ENS immediately brought in Comware, a company run by Charles Carlson (upon information and belief, an associate of Ramey) to act as intermediary.  Unbeknownst to Cisco, ENS remained in place, hidden behind the fiction of Comware acting as the new "Managed Service Provider" for "Provident."

67.    Upon information and belief, on or around April 17, 2018, Ramey, ENS and Carlson met to figure out how to continue the "Provident" scheme once ENS was supposed to be excised from the process.  Soon after, on April 23, 2018, Ross Miller of ENS emailed Ramey saying: "I'm going to start using this email to communicate with GDT/Comware 'ross@msc-corp.net.'"  Miller also listed other items for the group to discuss, including that "MCS was up and running with Comware," that ENS was "resending PO's," and inquiring what the differences would be for ENS going this new "route."  Two days later, Miller further asked Ramey what email he should use to send the new purchase orders.  Ramey provided new emails for himself and his assistant:  "jeff@todoverdellc.com" and "nida@todoverdellc.com." [3]

68.    Cisco is informed and believes that the new "Provident" scheme from April 2018-forward ran as follows:

- First ENS would create an estimate for products it wished to purchase under the "Provident" deal and would send that estimate to Ramey and his team at GDT, either directly via email or by using Cisco's online "BuildPrice" tool.[4]

---

[3] Upon information and belief, Todoverde Consulting Ventures, LLC is a company formerly owned by Ramey and Carlson and currently owned by Ramey in some capacity.

[4] Cisco's "BuildPrice" tool does not send any notification to Cisco of the creation of an estimate unless a Cisco email address is specifically included as a recipient.  Based on Cisco's review of information to date, ENS never included Cisco personnel as recipients for quotes created on the "BuildPrice" tool.

- Ramey's assistant, Venida Jackson, would then send the estimate to Cisco requesting a quote for the products under the "Provident" account.

- Cisco would then take the estimate provided by GDT (which was devoid of any reference to any end customer other than "Provident"), create a quote for the requested product, and send it back to Jackson at GDT.

- Upon information and belief, Jackson, Ramey, or another member of Ramey's team at GDT working at his direction, would then take Cisco's quote and send a matching quote under GDT's letterhead for the same products to ENS, identifying the end customer as "Provident."

- ENS would then send a purchase order to Comware, with the "Ship To" as ENS' Colorado address.

- Comware would then send a purchase order for the same product to Ramey with a P.O. Number matching the same exact P.O. Number received from ENS.

- Ramey would then place the order with Cisco under the "Provident" account, but reflecting ENS' purchase order number in the "End Customer to Reseller PO Number" field.  Cisco has been able to use such "P.O. Numbers" to link the hundreds of products purchased under the "Provident" account back to ENS.

69.    As is clear from the above, even after Ramey told Cisco that ENS would no longer be involved in any way, Ramey still received estimates for product from ENS directly, still submitted those estimates to Cisco under the "Provident" account, and still made sure the product shipped to ENS' address in Colorado.

70.    If Comware was truly the new Managed Service Provider for "Provident," which it was not, there would have been no need for ENS' continued involvement after April 2018.

**vi.    Cisco Uncovers Mass Diversions**

71.    After years of deceiving Cisco, Ramey's and ENS' luck ran out in the fall of 2018. In early October of that year, Cisco Brand Protection noticed that many of the products sold under "Provident" Deal IDs were turning up with SMARTnet contracts registered to different end customers.  In order to investigate, Cisco Brand Protection contacted some of the SMARTnet

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   customers and determined that the "Provident" product was being resold on the secondary market

2   by ENS.

3        72.     In one instance, the Mine Hill School District registered a SMARTnet contract on a

4   product that was sold under a "Provident" Deal ID.  Cisco Brand Protection contacted Mine Hill to

5   inquire about the purchase, and was informed that Mine Hill had purchased its products and

6   SMARTnet contracts from a Cisco Authorized Reseller, Promedia.  When Cisco spoke with

7   Promedia about the source of the products, Promedia admitted to purchasing the products from

8   ENS and claimed that ENS coached it on what to say to Cisco if questioned.  Promedia informed

9   Cisco that ENS directed it to claim innocence and blame the out-of-channel purchase on a mistake

10  by a new person in purchasing.

11       73.     On October 11, 2018, Cisco Brand Protection contacted the then-current Account

12  Manager for "Provident," Sydney Green, to discuss the diversions.  The meeting was set for

13  Monday, October 15, 2018 and, in the interim, Ramey provided Green with contact information –

14  for the first time – for his purported contacts at "Provident," apparently in an attempt to help

15  Green answer Brand Protection's questions.  Ramey provided the following names:  "Tommy

16  Sanders-PRA, Charles Carlson-Comware."

17       74.     As with other "Provident" Account Managers, Green had been prevented from

18  contacting anyone at "Provident" by Ramey and was told that the end customer did not want to

19  have to deal with Cisco.  Green was also unaware that ENS had remained involved with the

20  "Provident" account after the April 2018 Brand Protection inquiry.

21       75.     On October 15, 2018, Ramey – for the first time in the history of the "Provident"

22  deals – offered to set up a call between Green, "Tommy," and Charles of Comware saying in a text

23  message: "Can you talk to Tommy and Charles at 2pm? I just [sic] back to the office and got a

24  hold of both of them."

25       76.     As is part of the Brand Protection team's procedure when a potential, large-scale

26  diversion is discovered, Cisco then sent Ramey a "Sales Certification," which required affirmation

27  from both GDT and the purported end customer, "Provident," that the products sold under the

28  "Provident" name were, in fact, for "Provident's" use as end customer.  Upon information and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

belief, Ramey then brought the Sales Certification to GDT's General Counsel, Blataric.  Cisco is informed that Ramey then told Blataric that his contact at "Provident" was "Tommy Sanders" with an email address of "tsanders@pra.com."  Blataric later told Cisco that Ramey then pretended to send the Sales Certification to "Provident," including "tsanders@pra.com" as the recipient and Blataric as a "cc."  In doing so, Cisco is informed and believes that Ramey intended to deceive Blataric as he knew that he would receive a "bounce-back" for this fake email address, but that Blataric would not.  Later, after speaking with Cisco Brand Protection, Blataric sent an email herself to "tsanders@psa.com" and did, in fact, receive a "bounce-back."

77.  Upon learning of the "Tommy Sanders" name, Cisco Brand Protection investigated whether the information provided regarding the "Provident" contact was accurate.  Through that investigation, Cisco uncovered that the real Provident Realty Advisors never had an employee named Tommy Sanders and that its email domain is "providentrealty.net," not "pra.com."  Cisco also learned that the "pra.com" domain is used by an unrelated company in Chicago, which has also never had an employee named Tommy Sanders.  The real Provident Realty Advisors also told Cisco that it has never purchased Cisco products and has never heard of Ramey.  According to Blataric, she had also contacted the real Provident Realty Advisors' human resources department and confirmed that there was no Tommy Sanders associated with the company.

78.  In a later interview with Cisco in December 2018, Ramey claimed that he was surprised his email to "Tommy" in October had "bounced back" and claimed that he had tried to place numerous calls to Tommy at the time but couldn't reach him.  Ramey further claimed that, once he couldn't get through, he learned that "Tommy" had left "Provident" the previous May – directly contradicting his text message to Green on October 15th in which he said that he had just gotten a hold of "Tommy" and Carlson.

79.  As far as Cisco can tell from the information uncovered to date, Tommy Sanders was a name wholly invented by Ramey, ENS, or both.  It is unclear who Ramey would have put on the phone as "Tommy" had Green accepted the invitation to speak in October, but, based on the information Cisco has uncovered thus far, it could not have been a representative of the real Provident Realty Advisors.

20

80.     Cisco never received signed Sales Certifications from Ramey or "Provident" and later learned that GDT terminated Ramey on or about October 24, 2018.

### vii.     Ramey's Last-Ditch Push for a Deal with Quantil Networks

81.     Upon information and belief, at least as late as October 19, 2018, Ramey and ENS were conspiring to continue defrauding Cisco and conceal their discount scheme from Cisco's investigators.

82.     On October 15, 2018, right as Cisco's Brand Protection was uncovering the suspicious activity on the "Provident" account, Ramey attempted to push through a deal for the purchase of Cisco products to a new purported end customer, "Quantil Networks."  Ramey requested a quote for a deal for Quantil Networks through Cisco's online portal using his "jeff@sambri.net" account to create the quote for the deal.[5]

83.     Ramey told Cisco that Quantil supposedly wanted to purchase $8.4 million worth of networking gear, and asked for a discount of 80-90%.  Ramey also told Cisco that Quantil ran data centers in China, but was looking to open a data center in the U.S.  Ramey provided the names of two individuals allegedly working at Quantil:  Jason Hodgins, Director of IT and Chad Cox, in procurement.  Ramey also provided a phone number and email for Chad Cox: ccox@quantilnetworks.com.

84.     Cisco Brand Protection flagged the submitted deal and began researching the information provided regarding Quantil.  Cisco discovered that the email address provided appeared to be non-operational, and uncovered that the phone number of "Chad Cox" was associated instead with Chad Love, Chief Sales Officer at ENS.  Cisco also contacted Quantil's Human Resources Director who had never heard of Chad Cox or Jason Hodgins and confirmed the two individuals did not work at Quantil.  Cisco refused to approve the deal as it could not confirm it was a legitimate purchase and as the information provided linked back – once again, to ENS.

---

[5] Ramey would often communicate with individuals using a non-GDT email address: jeff@sambri.net.  Upon information and belief, Ramey used this address to obfuscate his conduct from his employer, GDT.  Sambri refers to Sambri Services, LLC, a company that was, at least at one time, owned by Jeff Ramey.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

85.     This late-stage attempt by Ramey and ENS to thwart Cisco's efforts to detect their fraud illuminates the lengths Defendants were willing to go to continue their scheme.

**H.     Additional Facts Regarding ENS' and Ramey's Efforts to Induce Breaches by Cisco Authorized Resellers**

86.     Along with their efforts to extract extremely high discounts from Cisco based on falsified information, ENS and Ramey also purposefully targeted Cisco Authorized Resellers as end customers of the diverted "Provident" product.

87.     One such Cisco Authorized Reseller was SSP Data ("SSP"), a Cisco Authorized Reseller located in Richmond, California.  In February 2018, Chad Love of ENS emailed Sandesh Mutha, the principal of SSP, inviting him to participate in a call, and adding the following message:  "super secret Cisco meeting... shhhhhhhhhh."  Upon information and belief, Ramey was brought in to assist ENS' effort to court SSP into purchasing the diverted "Provident" product, eventually flying to San Francisco to meet with SSP in person.  Knowing that SSP had contractual obligations to Cisco to only purchase and resell Cisco products from Cisco's authorized distribution channel, Ramey and ENS actively encouraged SSP to purchase Cisco products from ENS, claiming Ramey and ENS could offer SSP better prices (obtained through the "Provident" scheme).

88.     Among other Cisco Authorized Resellers, ENS and Ramey also contacted High Availability, Inc., and, while acknowledging High Availability's obligations to Cisco as a Partner, encouraged the company to buy from ENS claiming that it could "now bring an offering to Cisco partners that allows a unique competitive advantage without partnership consequence like a so called 'Gray Market' product."

89.     Even ENS' President, George Stathakis, was copied on emails regarding knowing sales to Cisco Authorized Resellers.  At one point, Mr. Stathakis asked Ramey whether product obtained under Ramey's scheme could be shipped to Canada, saying: "Jeff, I want to make sure our guys are advising customers appropriately."

90.     ENS and Ramey contacted many other Cisco Authorized Resellers in a similar way, with full knowledge of their partnership status with Cisco and the obligations that come

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

along with that status – including at least two Cisco Gold Authorized Resellers.  At one point, in March of 2018, Chad Love of ENS emailed Ramey and ENS President Stathakis saying: "I have a trip to SF on Friday, meeting with three VAR CEOs to implement our new channel."  Upon information and belief, the "new channel" referred to was the "Provident" discount scheme.

### I.   Ramey and ENS Acted Willfully and With Knowledge

91.   Many factors suggest that, despite what they have claimed or may later claim, Ramey and ENS had knowledge of the discount scheme throughout its duration.

92.   To begin, ENS, Ramey and Comware all met on December 6, 2016, just days before Ramey submitted the first deal under the "Provident" name.  Upon information and belief, Ramey may have known of the "Provident" name through Charles Carlson of Comware, who had separate audio-visual business with the real Provident Realty Advisors.

93.   Ramey also emailed with individuals at ENS frequently and referenced a coordinated plan to take advantage of their "partnership" and splitting margins with ENS.

94.   Ramey communicated directly with ENS regarding orders explicitly for end users with no connection to the real Provident Realty Advisors (SFO, Northrop Grumman, etc.) or explicitly for the purpose of stocking ENS' shelves, and then submitted those orders under the "Provident" account to Cisco.

95.   Despite what Ramey claimed in an interview with Cisco in December 2018, contemporaneous emails reveal that Ramey was in near constant email communication with numerous individuals at ENS regarding the purchase of Cisco product including Ryan Bolger, Bill Cox, Chad Love, and Ross Miller.  Ramey also had regular calls with ENS' staff, and, upon information and belief, even weekly calls at one point to ensure that the process was working correctly.

96.   ENS also sent numerous emails to Ramey regarding purchases to be made under the "Provident" discount at Cisco, but noting that the "Provident" name should not appear when the product was delivered to ENS' true end customers, saying, for example, the following:

- "**Customer does not want it to show PRA**, ENHANCED or the actual end user." (emphasis added)

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

- "Site IDs – what is the process to change? How long does it take? What about site IDs on stock items? **We don't want PRA on anything**" (emphasis added)

- "Just spoke with Jeff and the site ids will come with just Ingram micro, says Jeff. If so that will suffice ... **if it shows comware, gdt, or PRA, that's where we need to revise**."  (emphasis added)

- "**It looks like these units still show PRA as the End Customer**."  (emphasis added)

97.    In fact, in October 19, 2018, after Cisco Brand Protection began uncovering the massive fraud, Chad Love of ENS emailed Ramey and included ENS President Stathakis saying "**I have a feeling everything you sent on the gdt/PRA equipment after Washington blew up is gonna unravel**."[6] (emphasis added)

98.    Ramey and ENS' Chad Love also made one, last-ditch effort to defraud Cisco on the Quantil deal, once the "Provident" scheme was unraveling.

99.    Ramey, ENS or both also created fake documents to substantiate "Provident" being linked to the purchases, provided fake names ("Tommy Sanders" and "Chad Cox") and provided false contact information to Cisco.

100.    In sum, Ramey and ENS' efforts to defraud Cisco and induce Cisco's Authorized Resellers to breach their agreements with Cisco (among other things) were deliberate, willful, and done with full knowledge that there was never any true "Provident" end customer behind any of the deals submitted to Cisco.

---

[6] Despite these clear statements in emails from ENS' own executives, ENS has had the audacity to claim in verified filings in Texas State Court regarding its separate dispute with GDT that it had no idea the "Provident" name was being used and that, after the scheme was uncovered, "GDT has provided a spreadsheet showing that a GDT representative (on information and belief, Ramey or an assistant working with him) allegedly internally concealed GDT's sales to Mushkin by identifying a company named 'Provident' or 'Provident Realty Partners' as the recipient of the product."  *See*, Mushkin's Verified Petition to Take Depositions Before Suit, *Mushkin, Inc., d/b/a Enhanced Network Systems*, Cause No. DC-19-04815, Dallas County District Court, pp. 3-4.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

**J.**     **Defendant ENS' Sales and Importations of Counterfeit Products**

101.    ENS has not only been involved in the "Provident" scheme or the inducement of breaches by Cisco Authorized Resellers, but has long been known to import and sell counterfeit Cisco products, despite several cease and desist letters from Cisco.

102.    Between 2008 and 2018, ENS sold at least 477 counterfeit "Cisco" products to private entities and entities hosting sensitive government infrastructure, including the U.S. Department of State, the Department of Justice, the U.S. Navy, the California Department of Industrial Relations, financial institutions, and multiple private entities.

103.    ENS also attempted to import counterfeit Cisco products on at least two occasions.

**i.**     **ENS' Historical Sales of Counterfeit Products**

104.    In 2008, Cisco engineers determined that 89 transceivers sold by ENS to Telmar Network Technology were later determined to be counterfeit.  ENS had originally represented to Telmar that the products were "Cisco original refurb or used."

105.    On June 23, 2010, an investigator working on behalf of Cisco Brand Protection purchased one WIC-1DSU-T1-V2, four GLC-SX-MM transceivers, and two W-G5483 switches from Chad Fermin of ENS.  Each of the products was advertised by ENS as "new."  Cisco engineers later determined that the four transceivers and two WS-G5483 products were counterfeit.  In response to this test purchase from ENS, counsel for Cisco sent a cease and desist letter to ENS on January 24, 2011, advising ENS to cease trafficking in counterfeit "Cisco" goods and offering ENS an opportunity to cooperate with Cisco.  On January 31, 2011, ENS' General Counsel Frank Bergner denied that ENS had engaged in any federal and state trademark infringement.

106.    On September 21, 2010, the Department of State, Monitor and Incident Response Division, ordered, among other things, 13 switches and 56 transceivers from then-Cisco Authorized Reseller MA Labs.  MA Labs, in violation of its partnership agreement with Cisco, sourced the products from ENS at a significantly discounted price from Cisco's Global List Price. The products were "drop-shipped" (i.e., shipped directly from ENS) to the Department of State. Later, Cisco determined that ENS had purchased the products at a 78% discount for the 56

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

transceivers.  In November 2010, Cisco Brand Protection discovered that there were potentially counterfeit products in place with the Department of State and reached out to obtain serial numbers and MAC addresses of the units purchased from MA Labs in order to run a preliminary counterfeit analysis.  The Department of State provided the information, which Cisco used to determine that the products were potentially counterfeit.  Cisco requested that two of the switches be sent to Cisco for further analysis.  After review, Cisco determined that the two switches were, indeed, counterfeit.  The Department of State returned all of the remaining products sourced from MA Labs and ENS.  Cisco analyzed each of the products and determined that all 13 switches were counterfeit and that 55 out of the 56 transceivers were counterfeit.

107.    In October 2010, the Department of Justice, Tax Division, purchased, among other things, 40 GLC-SX-MM transceivers from an unauthorized reseller, Pante Technology Corporation.  Pante Technology sourced the transceivers from ENS.  Upon analysis, 17 of the 40 transceivers were determined to be counterfeit.  Another 179 products sold by ENS to Pante and then to the Department of Justice were also later determined to be counterfeit.

108.    On December 3, 2010, a former Cisco Authorized Reseller, TSI, purchased 41 switches and dozens of other Cisco products from ENS.  The products were shipped to a defense contractor's secure facility and later shipped to the Department of State.  After the switches were installed, Cisco alerted the Department of State to a potential issue with the products. Three of the switches provided by TSI were later analyzed via photographs from the Department of State and determined to be counterfeit.

109.    On December 30, 2010, former Cisco Authorized Reseller, Aglow Technologies, Inc., sold 150 GLC-SX-MM transceivers to the U.S. Navy, Naval Education and Training Center. Aglow purchased the products from ENS, which drop-shipped at least 140 of the products directly to the U.S. Navy.  On January 20, 2011, an analysis of 10 of the products sourced from ENS were determined to be counterfeit.  A subsequent photo analysis of five additional products revealed that each of those products was counterfeit as well.  A further analysis of 58 additional serial numbers were determined to be highly suspect as counterfeit.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

110.    On March 27, 2011, an investigator working on behalf of Cisco Brand Protection conducted a second test purchase from ENS.  The investigator purchased four GLC-SX-MM transceivers, two GLC-LH-SM transceivers, and one WS-C3560V2-24PS-S switch, each of which was listed as "new."  An analysis by Cisco engineers revealed that each of the products was counterfeit.

111.    In or around May 2011, Cisco engineers determined that two WS-C3750X-24T-S switches, which were sourced from ENS by Cisco Authorized Reseller ProTech Computer Systems, Inc. and sold to URS Energy and Construction, were counterfeit.

112.    On or around May 20, 2011, engineers analyzed five of 80 GLC-SX-MM transceivers, which had been sourced from ENS by Checkpoint Services, Inc., a former Cisco Authorized Reseller, and sold to Tarrant County College.  The engineer determined that the five products analyzed were each counterfeit.

113.    On or around September 16, 2011, a Cisco engineer determined that a WS-C3750-48TD-S switch, which had been sourced from ENS by ASA Computers and which had failed, was counterfeit in that the chassis serial number had been modified.

114.    On or about September 17, 2011, U.S. Customs and Border Patrol ("CBP") seized two "Cisco" WS-C3750-48TS-E switches that were determined to be counterfeit.  The importer of the switches was identified as "Enhanced Network Systems," with an address of 26072 Merit Circle, Ste. 124, Laguna Hills, CA 92653.

115.    In early 2015, Cisco Authorized  Reseller eIRONclad Technology Solutions sold three WS-C3650-24TS-E switches and three WS-C3650-48TS-E switches sourced from ENS to the California Department of Industrial Relations in Oakland, California.  Upon an examination of the six switches, Cisco engineers determined that each of WS-C3650-24TS-E switches had been originally manufactured as a WS-C3650-24TS-L device, which is a product of lesser functionality and value than the WS-C3650-24TS-E switch.  Similarly, Cisco engineers determined that the three WS-C3650-48TS-E switches had been originally manufactured as WS-C3650-48TS-L switches, which is a product of lesser functionality and value than the WS-C3650-48TS-E device.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

Therefore, Cisco determined that each of the six switches was different from the switches they were originally manufactured and sold as, and thus was counterfeit.

116.    In February 2015, Cisco engineers examined console readouts from 3 of 35 WS-XG148E-GE-45AT cards, which had been sourced from ENS by Dyntek Services, Inc., a Cisco Authorized Reseller, and sold to Credit One Bank in Las Vegas, Nevada, and determined that each was counterfeit.

117.    On or about June 18, 2015, CBP seized two counterfeit "Cisco" labels. The importer of the products was identified as "Enhanced Network Systems, Ryan Bolger, 14 Inverness Drive East, Suite F-100, Englewood, CO 80112."  On or about October 28, 2015, counsel for Cisco sent a cease and desist letter to Ryan Bolger referencing the June 18 seizure.  On October 30, 2015, ENS' general counsel, Frank Bergner, Jr., responded denying that ENS had sold any infringing product.

### ii.    ENS' Recent Sales of Counterfeit Products to Wonderful College Prep Academy

118.    In May 2018, Cisco Authorized Reseller Lattis Networks purchased several wireless access points and six WS-C2960-48FPS-L switches from ENS.  Lattis Networks placed each of the products under SMARTnet support and sold them to Wonderful College Prep Academy.

119.    Cisco Brand Protection later uncovered that the wireless access points sourced from ENS were purchased through ENS under the "Provident" account.

120.    Cisco also requested to inspect the six switches to determine whether they were genuine or counterfeit, and determined that five of the six switches were, in fact, counterfeit.

### iii.    ENS' Recent Sales of Counterfeit Products to Chrome Data

121.    In June and July of 2018, Cisco Authorized Reseller Virtual Enterprises, Inc. (dba Advanced Systems Group) purchased eight WS-C2960XR-48FPD-I switches from ENS, placed the products under Cisco SMARTnet contracts and sold them to end customer Chrome Data.

122.    Later, a different end customer attempted to obtain SMARTnet coverage for products matching the identical serial numbers of the products sold to Chrome Data.  Cisco denied

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  the SMARTnet coverage due to identical serial numbers already being registered for the Chrome

2  Data products.  Upon investigation, Cisco Brand Protection determined that the products sold by

3  Advanced Systems Group to Chrome Data appeared to have falsified serial numbers, thus creating

4  the issue with the later end customer attempting to obtain SMARTnet coverage for the same

5  products.

6       123.    Cisco later examined all eight switches and determined that they were all

7  counterfeit.

8       **K.    Harm to Cisco From Ramey's and ENS' Scheme and ENS' Infringing Sales**

9       124.    As a result of Ramey and ENS' "Provident" scheme, Cisco has lost millions of

10  dollars by unwittingly selling heavily discounted Cisco products to a competitor, ENS, which then

11  resold to either potential or current Cisco end customers.  These sales displaced Cisco's own sales

12  of its new or refurbished Cisco products to its authorized sales channel.

13       125.    When a Cisco product is diverted through a discount scheme and resold to a

14  different end customer, Cisco is ostensibly forced to replace or service such products, but lacks the

15  same quality control or insight into those products, which may be mixed with counterfeit Cisco

16  products (as with Wonderful College Prep Academy above), all of which would not be entitled to

17  SMARTnet and would either need to be relicensed or replaced, sometimes at Cisco's own

18  expense.

19       126.    Discount fraud schemes, such as the one perpetrated by Ramey and ENS, cause

20  Cisco customers to lose faith in Cisco's sales and distribution channels, and lead to confusion in

21  the marketplace.

22       127.    ENS' sales of counterfeit products also separately cause Cisco significant harm.

23  The sale of counterfeit products can place an end customer's IT infrastructure in jeopardy as the

24  provenance of the counterfeit product, and whether it has any potentially malicious embedded

25  software or hardware, is unknown.  The sale of purely counterfeit products also displaces the

26  legitimate sale of Cisco products to Cisco customers.

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

**FIRST CAUSE OF ACTION**

**INDUCING BREACH AND INTERFERING WITH CONTRACT**

**As against Defendants Jeffrey Ramey and Enhanced Network Systems**

128.     Cisco incorporates paragraphs 1-127 of this Complaint as if fully set forth herein.

129.     Under the terms of Cisco's ICPA, Cisco's Authorized Resellers are contractually required to sell Cisco products and service contracts only to End Users, and to purchase Cisco products and service contracts only from Cisco or an authorized source (identified in the contract as applicable in the United States as a Cisco Authorized Distributor).  Defendants are aware of these contractual obligations.  Ramey, as an employee of Cisco Authorized Reseller, GDT, was subject to these contractual obligations during the time period of Cisco's allegations set forth in this Complaint.  For its part, given the company's extensive experience as resellers of Cisco products in the secondary market and extensive communications between ENS and Cisco partners, Cisco is informed and believes that ENS was aware of the status of the Cisco Authorized Resellers they approached, and their contractual obligations to Cisco.  The Defendants also often specifically targeted Cisco Authorized Resellers to sell their heavily discounted Cisco products.  As just one example, ENS representative Chad Love expressly acknowledged the contractual obligations of Cisco Authorized Reseller High Availability Inc. to only purchase from within Cisco's authorized channel when soliciting the company for its business.  When informed that High Availability could not purchase outside of the authorized channel, ENS claimed, falsely, that purchasing from ENS would not be in violation of High Availability's contractual obligations to Cisco.

130.     Through its actions in specifically targeting Cisco Authorized Resellers to resell their heavily discounted products obtained through the "Provident" scheme, Defendants intended to cause each of the Cisco Authorized Resellers to breach their contractual obligations to Cisco by purchasing products outside of the authorized Cisco distribution channel.

131.     As a direct and proximate result of Defendants' intentional inducements of breaches of the ICPA identified herein, Cisco has suffered and will continue to suffer direct, consequential and other damages, including but not limited to, out-of-pocket expenses related to

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   services provided on unauthorized Cisco products, in an amount to be determined at trial in excess

2   of $75,000.  Defendants' inducement of breach was also a substantial factor in causing Cisco's

3   harm.

4   <center>**SECOND CAUSE OF ACTION**</center>

5   <center>**FRAUD**</center>

6   <center>**As against Defendant Jeffrey Ramey**</center>

7   132.    Cisco incorporates paragraphs 1-131 of this Complaint as if fully set forth herein.

8   133.    Defendant Ramey committed multiple acts of fraud including making numerous

9   written and oral statements to Cisco to induce Cisco to provide special highly discounted pricing

10  for deals purportedly intended to benefit Provident Realty Advisors, but, in reality, to benefit

11  Ramey and ENS.  Each of the individual submissions to Cisco for special discount pricing under

12  the "Provident" account constitutes fraud individually, and as a whole.  The specific example set

13  forth below is meant to illustrate the fraudulent representations made by Defendants to Cisco to

14  obtain the special discount pricing, and is in no way meant to be completely demonstrative of

15  Ramey's fraudulent conduct.

16  134.    For example, on or around April 27, 2017, Ramey represented to Cisco that he

17  needed competitive pricing in order to win the "Provident" business telling Cisco a discount was

18  "Necessary to beat out competition in a highly competitive timeframe.  Contingent on PO today.

19  Longer term opportunity to displace ubiquity with meraki at multi commercial real estate site in

20  FY 18."  Cisco reasonably relied on Ramey's statements, and granted Ramey's April 28, 2017

21  request for a discount, which resulted in Deal ID 17680067.  Ramey's representations were false,

22  because Provident Realty Advisors was never in contact with Ramey or ENS and did not request

23  to purchase Cisco products through Ramey with respect to this deal.  The product instead went to

24  the San Francisco International Airport.  Upon information and belief, Ramey was aware of the

25  falsity of his statements to Cisco for each of the "Provident" requests.

26  135.    Ramey was aware of the falsity of the representations to Cisco at the time they

27  were made because he was well aware that the products were intended for ENS or its customers,

28  with no connection to the real Provident.  The false representations were made with the intent to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   cause Cisco to rely on them, to deceive Cisco, and to induce Cisco to provide Ramey and ENS

2   with the special discounted pricing.

3       136.    Cisco reasonably relied on Ramey's misrepresentations, and acting on that reliance,

4   Cisco did, in fact, provide Ramey with special discounted pricing on approximately $17.1 Million

5   in Cisco product, for which Cisco would only receive payment of $4.1 Million.  But for Ramey's

6   representations, Cisco would not have provided Ramey with the special discounted pricing, to

7   which Ramey and ENS were not entitled.

8       137.    At all times during which the allegations described within this Second Cause of

9   Action occurred, Ramey, as an agent and employee of GDT, was a business partner of Cisco, and

10  under a contractual obligation to disclose accurate and truthful information to Cisco in relation to

11  any claim for special discount pricing.

12      138.    Ramey actively concealed from Cisco the important fact that he and ENS were not

13  purchasing product on behalf of Provident Realty Advisors.  Instead, Defendants, through Ramey,

14  sought heavily discounted Cisco products in order to sell them to third parties for profit.  Ramey

15  even made several efforts to actively prevent Cisco from contacting anyone at "Provident,"

16  including by providing false contact information and presenting a false story that "Provident"

17  wanted nothing to do with Cisco and would be upset if anyone from Cisco reached out to them.

18      139.    As a direct and proximate result of Ramey's fraudulent misconduct, Cisco has lost

19  valuable product that was shipped to ENS at a heavily discounted price, to which Defendants were

20  not entitled.  But for Ramey's representations and concealment of the truth, Cisco would not have

21  approved the special discounted pricing requests made by Ramey.

22      140.    Defendant Ramey and ENS worked in concert and are, thus, jointly and severally

23  liable to Cisco for the harm caused by Ramey's fraud.

24      141.    Upon information and belief, the aforementioned fraudulent representations,

25  omissions, and conduct by Ramey were willful, wanton, malicious, oppressive, demonstrated such

26  want of care and indifference to consequences, and were undertaken with the intent to deceive, so

27  as to justify an award of exemplary and punitive damages to Cisco.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

**THIRD CAUSE OF ACTION**

**AIDING AND ABETTING FRAUD**

**As against Defendant Enhanced Network Systems**

142.     Cisco incorporates paragraphs 1-141 of this Complaint as if fully set forth herein.

143.     With respect to Ramey's fraudulent misstatements and omissions to Cisco in furtherance of the "Provident" scheme, ENS had knowledge of the wrong Ramey was committing, provided substantial assistance to Ramey, cooperated or agreed to cooperate in making oral and written misrepresentations to Cisco, and knowingly benefitted from such fraud.  ENS also agreed to participate in the fraud against Cisco and performed various overt acts, as described more fully above, in furtherance of the fraud.

144.     As an illustrative example, ENS repeatedly acknowledged to Ramey its awareness that the "Provident" name was being used to process orders of product through Cisco, yet knew full well that no "Provident" was associated with any of ENS' own end customers receiving the product.  ENS also sought to actively conceal its role in the continued "Provident" scheme by, among other things, inserting Comware as an intermediary after Cisco Brand Protection first discovered ENS' involvement, and using alternative email addresses to communicate to Ramey regarding the "Provident" scheme.

145.     As a direct and proximate result of ENS' conduct in aiding and abetting Ramey's fraud, Cisco has lost valuable product that was shipped to ENS at a heavily discounted price, to which Defendants were not entitled.

146.     Ramey and ENS conspired to commit the acts described in the Second Cause of Action, in that Ramey and ENS acted together with a common purpose to fraudulently procure special discounted pricing from Cisco through blatant false representations about "Provident" and by concealing the actual customer for the heavily discounted products that Cisco sold under the "Provident" account.  Defendants took multiple steps to obfuscate the true nature of the end user.

147.     Defendants were each aware of the common plan to obtain such special discounted pricing and heavily discounted products from Cisco by committing these acts.  Further,

Defendants agreed to commit these acts and intended that these acts should be committed.  These Defendants committed overt acts in furtherance of this conspiracy until at least October 2018.

148.  Defendants worked in concert and are, thus, jointly and severally liable to Cisco for the harm caused by Ramey's fraud.

149.  In engaging in conduct to aid and abet Ramey's fraud, upon information and belief, Defendant ENS' actions were willful, wanton, malicious, oppressive, demonstrated such want of care and indifference to consequences, and were undertaken with the intent to deceive, so as to justify an award of exemplary and punitive damages to Cisco.

### FOURTH CAUSE OF ACTION

### CONSPIRACY

### As against Defendants Jeffrey Ramey and Enhanced Network Systems

150.  Cisco incorporates paragraphs 1-149 of this Complaint as if fully set forth herein.

151.  ENS was fully aware that Ramey planned to commit fraud through material misstatements and omissions to Cisco in furtherance of the "Provident" scheme, as described above.

152.  ENS not only had knowledge of the wrong Ramey was committing, but met with Ramey and communicated with Ramey in furtherance of Ramey's fraud throughout the "Provident" scheme.

153.  ENS cooperated or agreed to cooperate in making oral and written misrepresentations to Cisco, intended that the fraud be committed, and knowingly benefitted from such fraud as further described above.

154.  As a direct and proximate result of ENS' conduct in conspiring with Ramey to commit fraud, Cisco has lost valuable product that was shipped to ENS at a heavily discounted price, to which Defendants were not entitled.

155.  Ramey and ENS conspired to commit the acts described in the Second Cause of Action, in that Ramey and ENS acted together with a common purpose to fraudulently procure special discounted pricing from Cisco through blatant false representations about "Provident" and

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

by concealing the actual customer for the heavily discounted products that Cisco sold under the "Provident" account. Defendants took multiple steps to obfuscate the true nature of the end user.

156.   Defendants were each aware of the common plan to obtain such special discounted pricing and heavily discounted products from Cisco by committing these acts. Further, upon information and belief, Defendants agreed to commit these acts and intended that these acts should be committed. These Defendants committed overt acts in furtherance of this conspiracy until at least October 2018.

157.   Defendants worked in concert and are, thus, jointly and severally liable to Cisco for the harm caused by Ramey's fraud.

158.   In engaging in conduct to conspire to commit fraud, upon information and belief, Defendants' actions were willful, wanton, malicious, oppressive, demonstrated such want of care and indifference to consequences, and were undertaken with the intent to deceive, so as to justify an award of exemplary and punitive damages to Cisco.

## FIFTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### As against Defendants Jeffrey Ramey and Enhanced Network Systems

159.   Cisco incorporates paragraphs 1-158 of this Complaint as if fully set forth herein.

160.   From December 21, 2016 to September 27, 2018, Ramey submitted hundreds of requests for special discounted pricing under the "Provident" account name. Each submission contained numerous false statements and representations by Ramey which Ramey purported to be true.

161.   Each of the misrepresentations, including any representation related to or referring to Ramey and/or ENS' business relationship with Provident Realty Advisors, was false.

162.   Even if Defendants believed the representations they made were true, Defendants had no reasonable grounds for believing that the representations alleged herein, in which they claimed, among other things, that Ramey needed special discounted pricing for the "Provident" account in order to beat out Cisco's competitors, were true. Neither Ramey, nor ENS, had any business relationship with Provident Realty Advisors during the time period of the allegations set

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

forth in this Complaint.  Both Ramey and ENS knew that the purpose of Ramey's false representations to Cisco was to obtain the heavily discounted products to be resold to ENS' customers, to allow ENS to unfairly compete with Cisco's honest and law abiding Authorized Resellers, and to increase ENS' profit margins on its sales of Cisco products, to which Ramey was a direct beneficiary.

163.    Ramey made each and all of the false representations with the intent to induce Cisco to approve the special discounted pricing and sell heavily discounted Cisco products to Defendants.  ENS was aware of Ramey's false representations and provided substantial assistance to Ramey in obtaining the discounts under the "Provident" scheme from Cisco.  ENS also agreed to participate in the "Provident" scheme with Ramey and acted numerous times overtly in furtherance of the scheme.

164.    At the time these misrepresentations were made by Ramey, and at the time Cisco took the actions alleged herein, Cisco was ignorant of the falsity of the representations and believed them to be true.  In reasonable reliance on Ramey's representations, Cisco was induced to send, and did in fact send, heavily discounted Cisco products to Defendants.

165.    As a proximate result of Defendants' fraudulent and/or negligent conduct, Cisco has lost valuable product that was shipped to Defendants at prices that Defendants were not entitled to.  But for Defendants' fraudulent and/or negligent conduct, Cisco would not have approved any special discounted pricing for the products shipped to Defendants, or any discounts whatsoever, or shipped the Cisco products to Defendants at all, since ENS is not an End User. Cisco's reliance on Ramey's misrepresentations was a substantial factor in causing its harm.

### SIXTH CAUSE OF ACTION

### TRADEMARK INFRINGEMENT

### (15  U.S.C. § 1114)

### As against Defendant Enhanced Network Systems

166.    Cisco incorporates paragraphs 1-165 of this Complaint as if fully set forth herein.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

167.   The CISCO Marks are valid, protectable trademarks that have been registered as marks on the principal register in the United States Patent and Trademark Office.  Cisco is the owner and registrant of the CISCO Marks.

168.   As described in more detail above, ENS has used and counterfeited the CISCO Marks in connection with the marketing, promotion, and sale of its goods and services without Cisco's consent, in a manner that is likely to cause, and has actually caused, confusion and/or mistake, or that has deceived members of the consuming public and/or the trade.  Indeed, ENS' counterfeiting and infringing activities are likely to cause and are actually causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin, sponsorship, and quality of ENS' infringing products, counterfeit packaging, inferior warranty, and other related commercial activities.  As of the filing of this Complaint, upon information and belief, ENS is continuing to infringe the CISCO Marks unabated.

169.   The CISCO Marks and the goodwill of the business associated with them are tremendously valuable in the United States and worldwide because they are distinctive and universally associated in the public perception with the highest quality network and communications technology products and services.

170.   ENS has sold, offered to sell, distributed, and advertised—and, upon information and belief, continues to sell, offer to sell, manufacture, distribute, and advertise—infringing networking hardware products bearing CISCO Marks.

171.   The differences between ENS' unauthorized products and genuine Cisco goods are material, as consumers would consider those differences, alleged further above, to be material to their purchasing decisions.

172.   ENS' actions have caused, and are likely to continue to cause, confusion, mistake, and deception as to the origin and quality of ENS' unauthorized products because they are intentionally calculated to mislead the general purchasing public into believing that Defendants' unauthorized products originated from, are associated with, or are otherwise authorized by Cisco.

173.   Upon information and belief, ENS' infringing actions were committed fraudulently, willfully, and in bad faith, with knowledge of Cisco's exclusive rights to and goodwill in the

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  CISCO Marks, or with willful blindness to the same, and with the intent to cause confusion, to

2  cause mistake and/or to deceive.  Accordingly, ENS' actions constitute willful trademark

3  infringement and counterfeiting of the CISCO Marks in violation of 15 U.S.C. §§ 1114 and 1117.

4       174.   ENS' unauthorized use of the CISCO Marks constitutes trademark infringement of

5  the federally registered CISCO Marks and has caused substantial damage to Cisco and to the

6  reputation and goodwill symbolized by the CISCO Marks in violation of Section 32 of the

7  Lanham Act, 15 U.S.C. § 1114.  Upon information and belief, ENS' unauthorized use of the

8  CISCO Marks was conducted intentionally and with notice and full knowledge that the use was

9  unauthorized by Cisco.

10       175.   Cisco has been, and continues to be, damaged by ENS' infringement, including by

11  suffering irreparable harm through the diminution of trust and goodwill among Cisco consumers

12  and members of the general consuming public and the trade.  Cisco is entitled to an injunction

13  against ENS, and an order of destruction of all infringing products, as well as all monetary relief

14  and other remedies available under the Lanham Act, including but not limited to lost profits and/or

15  actual profits, trebled damages, reasonable attorney's fees, costs and prejudgment interest, and/or

16  statutory damages.

<div align="center">

**SEVENTH CAUSE OF ACTION**

**TRADEMARK COUNTERFEITING**

**(15  U.S.C. § 1114)**

**As against Defendant Enhanced Network Systems**

</div>

21       176.   Cisco incorporates paragraphs 1-175 of this Complaint as if fully set forth herein.

22       177.   The CISCO Marks are valid, protectable trademarks that have been registered as

23  marks on the principal register in the United States Patent and Trademark Office.  Cisco is the

24  owner and registrant of the CISCO Marks.

25       178.   As described in more detail above, ENS has used and counterfeited the CISCO

26  Marks in connection with the marketing, promotion, and sale of their goods and services without

27  Cisco's consent, in a manner that is likely to cause, and has actually caused, confusion and/or

28  mistake, or that has deceived members of the consuming public and/or the trade.  Indeed, ENS'

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    counterfeiting and infringing activities are likely to cause and are actually causing confusion,

2    mistake, and deception among members of the trade and the general consuming public as to the

3    origin, sponsorship, and quality of ENS' infringing products, counterfeit packaging, inferior

4    warranty, and other related commercial activities.  Upon information and belief, Defendants are

5    continuing to infringe the CISCO Marks unabated as alleged further above.

6            179.    ENS has publicly advertised, sold, offered to sell, and distributed counterfeit Cisco

7    products in interstate commerce in direct competition with Cisco and without authorization or

8    consent to use the CISCO Marks but with full knowledge of Cisco's notorious prior rights in those

9    marks.

10           180.    ENS' counterfeit Cisco products reproduce, counterfeit, copy, and colorably imitate

11   the CISCO Marks or display a spurious designation that is identical with, or substantially

12   indistinguishable from, the CISCO Marks.  Upon information and belief, ENS has applied its

13   reproductions, counterfeits, copies, and colorable imitations of the CISCO Marks to labels, prints,

14   and packages intended to be used in commerce upon or in connection with the sale, offering for

15   sale, distribution, or advertising of ENS' counterfeit products, which is likely to cause confusion,

16   to cause mistake, or to deceive.

17           181.    Upon information and belief, ENS' unauthorized use of the CISCO Marks on or in

18   connection with ENS' counterfeit products was conducted intentionally and with notice and full

19   knowledge that the use was unauthorized by Cisco.  Accordingly, ENS' actions constitute willful

20   trademark infringement and counterfeiting of the CISCO Marks in violation of 15 U.S.C. §§ 1114

21   and 1117.

22           182.    Cisco has been, and continues to be, damaged by ENS' infringement, including by

23   suffering irreparable harm through the diminution of trust and goodwill among Cisco consumers

24   and members of the general consuming public and the trade.  Cisco is entitled to an injunction

25   against ENS, and an order of destruction of all infringing products, as well as all monetary relief

26   and other remedies available under the Lanham Act, including but not limited to lost profits and/or

27   actual profits, trebled damages, reasonable attorney's fees, costs and prejudgment interest, and/or

28   statutory damages.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

**EIGHTH CAUSE OF ACTION**

**FEDERAL UNFAIR COMPETITION**

**(15  U.S.C. § 1125)**

**As against Defendant Enhanced Network Systems**

183.    Cisco incorporates paragraphs 1-182 of this Complaint as if fully set forth herein.

184.    ENS' has sold infringing products that are designed to appear identical to genuine Cisco products and thereby employ the same nature, style, look, and color as genuine Cisco products.  Moreover, as alleged above, ENS sells products that have affixed counterfeit or infringing versions or reproductions of the CISCO Marks to unauthorized products and/or to the packaging, wrapping, etc., in which the infringing products are packaged.  This unauthorized use of the CISCO Marks is likely to cause confusion, to deceive, and to mislead the consuming public into believing that there is some affiliation, connection, or association between ENS and Cisco and is likely to cause confusion, mistake, or deception as to the origin, source, sponsorship, authorization, approval, or affiliation of ENS' unauthorized products.

185.    ENS' actions, including the unauthorized use of the CISCO Marks in commerce, constitute false designation of origin, false or misleading descriptions of fact, and false or misleading representations of fact, which have caused, and are likely to continue to cause, confusion, mistake, and deception, as to ENS' association or affiliation with Cisco, or lack thereof, as well as to the origin, source, and sponsorship of ENS' unauthorized products, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

186.    ENS, in commercial advertising and promotion, has also misrepresented the nature, characteristics, qualities, or geographic origin of the Cisco products it sold, by falsely advertising that the infringing goods were genuine Cisco products.  The false advertising concerns material information that is likely to influence a consumer's purchasing decision.

187.    ENS' unauthorized and misleading use of the CISCO Marks, upon information and belief, constitutes willful infringement of the CISCO Marks in violation of 15 U.S.C. § 1114(1)(b) and entitling Cisco to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

188.    ENS' actions described above, including its unauthorized and misleading use of the CISCO Marks in commerce have caused, and unless enjoined, will continue to cause, substantial and irreparable injury to Cisco and to the business and goodwill represented by the CISCO Marks, thereby leaving Cisco without an adequate remedy at law.

## NINTH CAUSE OF ACTION

## CALIFORNIA UNFAIR BUSINESS PRACTICE

### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

**As against Defendants Jeffrey Ramey and Enhanced Network Systems**

189.    Cisco incorporates paragraphs 1-188 of this Complaint as if fully set forth herein.

190.    California Business and Professions Code § 17200, et seq. prohibits acts of unfair competition, which means any "unlawful, unfair, or fraudulent business act or practice."

191.    In pursuing the above-described schemes, Defendants have engaged in unfair, fraudulent, and unlawful business acts by conceiving of and participating in the "Provident" scheme, including, but not limited to false representations, material omissions, aiding and abetting fraud, and conspiracy to commit fraud.  In addition Defendant ENS has engaged in unfair and unlawful business practices in selling counterfeit and otherwise infringing "Cisco" products, and by causing confusion, mistake, and deception as to the origin and quality of the products they have sold in an effort to gain unfair competitive advantage and a windfall in the marketplace.

192.    Cisco further alleges, upon information and belief, that ENS continues to misrepresent the origin of products as being manufactured, or authorized for manufacture by Cisco, or manufactured by Cisco and as being without manipulation, in order to sell cheaper or non-genuine Cisco products at a higher price and to deceive consumers or potential consumers of Cisco products.

193.    Defendants' practices as alleged herein are, and continue to be, unlawful, unfair, and/or fraudulent, and constitute unlawful, unfair, and/or fraudulent competition as defined by Cal. Bus. & Prof. C. § 17200, *et seq.*

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    194.    Cisco seeks full restitution by Defendants, necessary and according to proof, to

2    restore any and all property and monies, including interest, acquired by Defendants, and all costs

3    caused to Cisco as a result of Defendants' unfair business practices.

4    195.    Defendants' actions have caused and, unless restrained by this Court, will continue

5    to cause irreparable injury to Cisco for which Cisco has no other adequate remedy at law for

6    Defendants' unfair competition and business practices.

7    **TENTH CAUSE OF ACTION**

8    **UNJUST ENRICHMENT**

9    **As against Defendants Jeffrey Ramey and Enhanced Network Systems**

10    196.    Cisco incorporates paragraphs 1-195 of this Complaint as if fully set forth herein.

11    197.    Defendants unjustly received benefits at the expense of Cisco through their

12    wrongful conduct, as alleged further above.  Defendants continue to unjustly retain these benefits

13    at the expense of Cisco.  The unjust receipt of the benefits obtained by Defendants lacks any

14    adequate legal basis and thus cannot conscientiously be retained by Defendants.  Therefore, the

15    circumstances of the receipt and retention of such benefits are such that, as between Cisco and

16    Defendants, it is unjust for Defendants to retain any such benefits.

17    198.    Cisco is therefore entitled to full restitution of all amounts and/or other benefits in

18    which Defendants have been unjustly enriched at Cisco's expense, in an amount to be proven at

19    trial.

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

# **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, Cisco, prays for judgment against the Defendants as follows:

A.      That the Court issue a preliminary and permanent injunction enjoining Defendants, their successors, officers, agents and employees, and anyone acting in concert with or at the behest or direction of them, from engaging in fraud schemes to obtain property from Cisco, including making false representations in order to receive specially-negotiated discounts for false End Users and from further acts of inducing third parties to breach their contracts with Cisco.

B.      That the Court issue a preliminary and permanent injunction enjoining ENS, their successors, officers, agents and employees, and anyone acting in concert with or at the behest or direction of them, from the importation, sale, offering for sale, or any other further acts of infringement of the trademarks at issue in this litigation and sales of counterfeit products, including inducing or contributing third parties to infringe.

C.      For a determination that ENS' acts of trademark infringement constitute cases of willful and exceptional infringement;

D.      For compensatory damages against Defendants in an amount to be determined by proof, but in no event less than $75,000;

E.      For consequential damages in an amount to be determined by proof;

F.      For any and all lost profits attributable to the alleged conduct in an amount to be determined by proof;

G.      For maximum statutory damages available under the law to the extent Cisco elects statutory damages for any claim for relief;

H.      For punitive and exemplary damages in an amount to the fullest extent available under the law;

I.      For restoration of all money and property which have been acquired by means of unfair competition;

J.      For pre-judgment interest;

K.      For Cisco's costs incurred in this action, including any attorney's fees to which Cisco may be entitled;

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1        L.       For treble and/or enhanced damages to the fullest extent available under the law;

2        M.      For any additional injunctive relief, specific performance, and/or other provisional

3 remedies, as appropriate; and,

4        N.      For any such other and further relief as the Court deems just and proper.

DATED:  November 14, 2019         SIDEMAN & BANCROFT LLP

By:   */s/ Lyndsey C. Heaton*
       Jeffrey C. Hallam
       Lyndsey C. Heaton
       Michael H. Hewitt

Attorneys for CISCO SYSTEMS, INC.
and CISCO TECHNOLOGY, INC.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111

## JURY DEMAND

Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. Proc. 38, Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. hereby demand a trial by a jury on all issues herein so triable.


DATED:  November 14, 2019                SIDEMAN & BANCROFT LLP


                                         By:   */s/ Lyndsey C. Heaton*
                                               Jeffrey C. Hallam
                                               Lyndsey C. Heaton
                                               Michael H. Hewitt

                                         Attorneys for CISCO SYSTEMS, INC.
                                         and CISCO TECHNOLOGY, INC.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111